UNITED STATES DISTRICT COURT

☐ ORIGINAL

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                  :          **INDICTMENT**

   - v. -                                                 :          23 Cr. _____ ( )

VLADIMIR VORONCHENKO,                     :
a/k/a "Vladimir Vorontchenko,"
                                                               :          **23 CRIM 073**

        Defendant.                               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

The Grand Jury charges:

**Overview of the Sanctions Violations and Money Laundering Schemes**

1.       From at least in or about April 2018 through at least in or about 2022, VLADIMIR VORONCHENKO, a/k/a "Vladimir Vorontchenko," the defendant, and others engaged in a scheme to violate the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701 *et seq.*, by conducting U.S. dollar transactions for the benefit of Viktor Vekselberg, a Russian oligarch who was sanctioned by the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC"). VORONCHENKO and others further engaged in a scheme to commit international money laundering to promote IEEPA violations.

2.       Before and after on or about April 6, 2018, when OFAC sanctioned Vekselberg by designating him as a Specially Designated National ("SDN"), Vekselberg beneficially owned and controlled through shell companies various real properties in the United States (the "Properties") currently worth approximately $75 million. VLADIMIR VORONCHENKO, a/k/a "Vladimir Vorontchenko," the defendant, a long-time friend and associate of Vekselberg, resided in certain of the Properties. Before OFAC designated Vekselberg as an SDN, VORONCHENKO and others caused U.S. dollar payments to be made to maintain

those properties, and he continued doing so after OFAC designated Vekselberg as an SDN even though VORONCHONKO knew about that designation.  In fact, after on or about April 6 2018, VORONCHENKO and others caused at least $4 million in U.S. dollar payments to be made to maintain the Properties and attempted to sell two of the Properties, without disclosure to or approval from OFAC.

### The Defendant and His Close Friend Viktor Vekselberg

   3. At all times relevant to this Indictment, VLADIMIR VORONCHENKO, a/k/a "Vladimir Vorontchenko," the defendant, was a Russian national and a legal permanent resident of the United States who resided in New York, New York, Southampton, New York, Fisher Island, Florida, and Russia.  VORONCHENKO held himself out as, and in fact was, a businessman, art collector, and art dealer, and a close friend and business associate of Vekselberg.

   4. At all times relevant to this Indictment, Vekselberg, a Russian national, was the founder and chairman of the board of directors of the Renova Group, a Russian conglomerate composed of investment funds and management companies in the energy sector.

### The Russia Sanctions Regime and Vekselberg's Designation as a Specially Designated Individual

   5. Enacted in 1977, the IEEPA gives the President of the United States certain powers, defined in 50 U.S.C. § 1702, to deal with any threats with respect to which the President has declared a national emergency and prescribes criminal penalties for violations.  Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter."  50 U.S.C. § 1705(a).

6.      On or about March 6, 2014, pursuant to his authority under the IEEPA and the National Emergencies Act ("NEA"), 50 U.S.C. § 1601 *et seq.*, the President issued Executive Order ("E.O.") 13660, declaring a national emergency to deal with the threat posed by the actions and policies of certain persons who had undermined democratic processes and institutions in Ukraine; threatened the peace, security, stability, sovereignty, and territorial integrity of Ukraine; and contributed to the misappropriation of Ukraine's assets.

7.      In further response to the actions and policies of the Government of the Russian Federation, including the purported annexation of the Crimea region of Ukraine, the President issued three subsequent Executive Orders that expanded the scope of the national emergency declared in E.O. 13660, pursuant to his authority under IEEPA and the NEA: E.O. 13661, E.O. 13662, and E.O. 13685.

8.      Together, these Executive Orders (collectively, "the Russia/Crimea Sanctions") authorize, among other things, the imposition of sanctions against persons responsible for or complicit in certain activities with respect to Ukraine; against officials of the Government of the Russian Federation; against persons operating in the arms or related material sector of the Russian Federation; and against individuals and entities operating in the Crimea region of Ukraine. On or about May 8, 2014, OFAC issued a set of regulations to implement the Russia/Crimea Sanctions. 31 C.F.R. part 589.

9.      The Russia/Crimea Sanctions also block the property and interests in property of individuals and entities listed in the Annex to E.O. 13661 or of those determined by the U.S. Secretary of the Treasury, after consultation with the U.S. Secretary of State, to meet the criteria in E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685.

3

10.     Blocking sanctions against individuals and entities designated pursuant to the Russia/Crimea Sanctions result in the individuals and entities being listed on the U.S. Treasury Department's List of Specially Designated Nationals and Blocked Persons ("SDN List"). Unless otherwise authorized or exempt, transactions conducted by U.S. persons, including U.S. financial institutions, or occurring in the United States, are prohibited if they involve transferring, paying, exporting, withdrawing, or otherwise dealing in the "property" or "interests in property" of an entity or individual listed on the SDN List because of the Russia/Crimea Sanctions. The property and interests in property of an entity that is fifty percent or more owned, whether individually or in the aggregate, directly or indirectly, by one or more persons whose property and interests in property are blocked pursuant to any part of 31 C.F.R. Chapter V are also blocked, regardless of whether the entity itself is listed.

11.     In addition to blocking the property and interests in property of persons and entities on the SDN List, the Russia/Crimea Sanctions further prohibit "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of" any person or entity on the SDN List. *E.g.*, E.O. 13661 § 4(a).

12.     An individual or entity may obtain a license from OFAC to transact with an individual or entity on the SDN List. Transacting with an SDN without first obtaining a license from OFAC is a violation of the IEEPA, 50 U.S.C. § 1705(a).

13.     On or about April 6, 2018, pursuant to E.O. 13662, OFAC designated Vekselberg as an SDN "for operating in the energy sector of the Russian Federation economy," and designated the Renova Group on the SDN List.

14.     On or about April 15, 2021, pursuant to his authorities under the IEEPA, the President issued E.O. 14024, which declared a national emergency with respect to the harmful

4

foreign activities undertaken by the Russian Federation.  To address this national emergency, the President blocked all property and interest in property that were then or thereafter came within the United States or the possession or control of any United States person, or individuals determined by the Secretary of the Treasury to meet one or more enumerated criteria, including individuals determined to operate in the technology or defense sectors of the Russian Federation economy. As with the Russia/Crimea Sanctions, OFAC issued certain regulations related to the E.O. 14024. 31 C.F.R. § 587.

15.    On or about March 11, 2022, pursuant to E.O. 14024, OFAC redesignated Vekselberg as an SDN "for having acted or purported to act for or on behalf of, directly or indirectly, the [Government of the Russian Federation] and also for operating or having operated in the technology sector of the Russian Federation economy," and blocked Vekselberg's yacht and private airplane.

### The Sanctions Violations and Money Laundering Scheme

16.    From at least in or about April 2018 through at least in or about 2022, VLADIMIR VORONCHENKO, a/k/a "Vladimir Vorontchenko," the defendant, and others engaged in (a) a scheme to violate the IEEPA by both conducting at least $4 million in U.S. dollar transactions to maintain the Properties and transferring ownership of the Properties after Vekselberg was designated as SDN on or about April 6, 2018, without disclosure to or approval from OFAC, and (b) a scheme to commit international money laundering by transferring funds into the United States with the intent of promoting IEEPA violations.

#### Vekselberg-Owned Shell Companies Purchase the Properties

17.    Between in or about 2008 and in or about 2017, Vekselberg, through a series of shell companies that he ultimately owned and controlled, acquired the Properties, specifically:

(a) two apartments on Park Avenue in New York, New York ("Park Avenue Apartment-1" and "Park Avenue Apartment-2" and, collectively, the "Park Avenue Apartments"); (b) an estate in Southampton, New York (the "Southampton House"); (c) an apartment in Fisher Island, Florida (the "Fisher Island Apartment"); and (d) a penthouse apartment in Fisher Island, Florida (the "Fisher Island Penthouse").

        a.      The two Vekselberg-owned shell companies used to purchase the Properties were Medallion, Inc. ("Medallion"), a Panamanian company, and Voxi Management Corp. ("Voxi"), a Bahamian company.

        b.      In particular, Medallion purchased Park Avenue Apartment-1 for approximately $11 million in or about 2008; Park Avenue Apartment-2 for approximately $610,000 in 2012; the Southampton House for approximately $11.4 million in or about 2008; and the Fisher Island Apartment for approximately $6.2 million in or about 2010.

        c.      Voxi, which was wholly owned by Medallion, purchased the Fisher Island Penthouse for approximately $31.2 million in or about 2017.

        d.      Vekselberg owned and controlled Medallion, and in turn Voxi, through a series of additional shell companies. Medallion was wholly owned by another Panamanian company ("Company-1"), which, in turn, was wholly owned by a Panamanian foundation ("Foundation-1"). The first and exclusive beneficiary of Foundation-1 was a British Virgin Islands company ("Company-2"), of which Vekselberg was the sole owner.

        e.      The Properties were thus beneficially owned by Vekselberg as shown below:



f.    As of the date of this Indictment, Vekselberg remained the ultimate beneficial owner of Medallion and Voxi, which, in turn, continued to own the Properties.

18.    To facilitate the purchase of the Properties, VLADIMIR VORONCHENKO, a/k/a "Vladimir Vorontchenko," the defendant, retained an attorney (the "Attorney"), who practiced in New York, New York, to represent Medallion and Voxi in the acquisition of the Properties.  At various times relevant to this Indictment, VORONCHENKO lived in Park Avenue Apartment-1, the Southampton House, and the Fisher Island Apartment.

19.    In connection with its consideration of Medallion's offer to purchase Park Avenue Apartment-1 in or about 2008, the board of managers of the building in which Park Avenue Apartment-1 was located sent an email to the Attorney that asked: "1) Who is behind the purchase of the Apartment?  2) What is the nature of their assets?  3) Who is going to live in the apartment?  And what is their relationship to the purchaser?"

7

20.     The Attorney replied by letter, dated on or about January 18, 2008: "[T]he beneficial owner of Unit 21 will be Mr. Viktor Vekselberg.  The occupant of the Unit for the next several years will be his cousin, friend and business colleague Vladimir Voronchenko [and Voronchenko's family]."  The Attorney's letter attached a letter from a director of Medallion that stated, "Mr. Viktor F. Vekselberg . . . is the Ultimate beneficial owner of [Medallion]."  The Attorney's letter also attached a *Forbes* article that listed Vekselberg as the 44th-richest person in the world, with a net worth of $10 billion.

21.     In or about 2012, in a lawsuit in the Southern District of New York related to renovations of Park Avenue Apartment-1, VLADIMIR VORONCHENKO, a/k/a "Vladimir Vorontchenko," the defendant, testified under oath at a deposition (the "Deposition").

a.     During the Deposition, VORONCHENKO described his relationship with Vekselberg as follows:

> From the beginning, we live in one small West Ukrainian city.  We are from this city together, you know, we — we are friends from the very small age.  Our families friend and we studied in one school and we continue our relation all our life. . . .
>
> He's my very, very close friend.  If you open the Internet and my, for example, name, you will see a lot of publications where we are together, this, this, and this, many, many, many times, you know.  And we're really very close friends . . . . You can check it even by Russian press, you know.

b.     During the Deposition, VOROCHENKO described his business, including with Vekselberg, as follows:

> I have different business.  I am involved in art, in luxury business, something like that.  In foundation, in museums.  I built in Russia now two museums, big one.  First two private museums in Russia.  Because we have with my friend, Viktor [Vekselberg], has huge collection, and we started to build, like, a home for the collection.

c. During the Deposition, VOROCHENKO testified that Medallion was a real estate investment company and that Vekselberg was the "main owner of this huge group," including Medallion.

22. In connection with the purchase of the Fisher Island Apartment, Medallion, VLADIMIR VORONCHENKO, a/k/a "Vladimir Vorontchenko," and a family member of VORONCHENKO ("Family Member-1") each applied for membership in a private club on Fisher Island (the "Club") in or about May 2010. As part of that application, the Attorney submitted an affidavit from a director of Medallion, which stated, in part, that the "ultimate beneficial owner of [Medallion] is Viktor Vekselberg," and that VORONCHENKO and his family would be living in the Fisher Island Apartment "not pursuant to a lease or compensated occupancy of any kind."

## VORONCHENKO Engages in Illegal U.S. Dollar Transactions to Maintain the Properties After Vekselberg's Designation as an SDN

23. VLADIMIR VORONCHENKO, a/k/a "Vladimir Vorontchenko," the defendant, hired the Attorney to manage the finances of the Properties, including to pay common charges, property taxes, insurance premiums, and other fees associated with the Properties. The Attorney conducted these U.S. dollar transactions using the Attorney's interest on lawyer's trust account ("IOLTA Account").

24. Prior to Vekselberg's designation as an SDN on or about April 6, 2018, between approximately February 2009 and March 2018, Medallion and Company-1 — both of which were beneficially owned by Vekselberg — sent approximately 90 wire transfers totaling approximately \$18.5 million to the IOLTA Account. At the direction of VLADIMIR VORONCHENKO, a/k/a "Vladimir Vorontchenko," the defendant, and another family member of VORONCHENKO who lived in Russia ("Family Member-2"), the Attorney used these funds

9

to make various U.S. dollar payments to maintain and service the Properties. These payments included tax payments, common charge payments, insurance premium payments, and other maintenance costs.

25.    VLADIMIR VORONCHENKO, a/k/a "Vladimir Vorontchenko," the defendant, was aware of Vekselberg's designation as an SDN on or about April 6, 2018. In response, on or about May 9, 2018, approximately one month after Vekselberg's designation, VORONCHENKO sent a WhatsApp message to an associate ("Individual-1") with a link to the website of a law firm in Washington, D.C. that specialized only in OFAC sanctions. On or about December 8, 2018, VORONCHEHNKO sent a WhatsApp message to Individual-1 containing a link to an article that discussed Vekselberg's designation as an SDN.

26.    After Vekselberg's designation as an SDN on or about April 6, 2018, Medallion and Company-1 — both ultimately beneficially owned and controlled by Vekselberg — stopped wiring funds to the Attorney's IOLTA Account. Instead, starting in or about June 2018, VLADIMIR VORONCHENKO, a/k/a "Vladimir Vorontchenko," the defendant, and Family Member-2 changed the source of the funds used to maintain and service the Properties to two VORONCHENKO-linked sources. The IOLTA Account received wires from a bank account in the Bahamas held in the name of "Smile Holding Ltd.," a shell company owned and controlled by VORONCHENKO, and from a Russian bank account held in the name of a relative of VORONCHENKO who lived in Russia ("Individual-2"). Between approximately June 2018 and March 2022, Smile Holding Ltd. and Individual-2 collectively sent approximately 25 international wire transfers totaling approximately $4 million to the IOLTA Account in the United States. Although the source of the payments changed after the imposition of sanctions on Vekselberg, the management of the payments remained the same as before. At VORONCHENKO's and Family

10

Member-2's direction, the Attorney continued to use these funds to make various U.S. dollar payments to maintain and service the Properties between approximately June 2018 and March 2022. No licenses from OFAC were applied for or issued for these payments.

VORONCHENKO's Attempted Sale of the Southampton House and<br>the Park Avenue Apartments in Violation of U.S. Sanctions

27.     In or about August 2020, VLADIMIR VORONCHENKO, a/k/a "Vladimir Vorontchenko," and others attempted to sell the Southampton House. Medallion, represented by the Attorney, entered into an agreement with a real estate brokerage firm ("Brokerage-1") to sell the Southampton House, which was ultimately listed for sale for approximately $14.6 million in or about September 2020. No license from OFAC was applied for or issued for the sale of the Southampton House. Brokerage-1 delisted the Southampton House in or about August 2021.

28.     In or about December 2021, VLADIMIR VORONCHENKO, a/k/a "Vladimir Vorontchenko," and others attempted to sell the Park Avenue Apartments. Medallion entered into an agreement with a real estate brokerage firm ("Brokerage-2") to sell the Park Avenue Apartments, which were ultimately listed for sale for approximately $14.6 million in or about early 2022. The Attorney signed the listing agreement on behalf of Medallion, and a family member of VORONCHENKO ("Family Member-3") communicated primarily with Brokerage-2 about the listing. No license from OFAC was applied for or issued for the sale of the Park Avenue Apartments. Brokerage-2 delisted the Park Avenue Apartments in or about June 2022, after receiving a Grand Jury subpoena.

VORONCHENKO's Flight After Receiving a Grand Jury Subpoena

29.     On or about May 13, 2022, federal agents served VLADIMIR VORONCHENKO, a/k/a "Vladimir Vorontchenko," the defendant, at the Fisher Island Apartment

with a subpoena issued by a Grand Jury sitting in the Southern District of New York, which called for his personal appearance for testimony and his production of documents on or about May 31, 2022.

30.    On or about May 15, 2022, two days after receiving the Grand Jury subpoena, VLADIMIR VORONCHENKO, a/k/a "Vladimir Vorontchenko," the defendant, sent a WhatsApp message to Individual-1 containing a link to an article, dated May 15, 2022, discussing the OFAC sanctions against Vekselberg.

31.    Approximately nine days after receiving the Grand Jury subpoena, on or about May 22, 2022, VLADIMIR VORONCHENKO, a/k/a "Vladimir Vorontchenko," the defendant, booked and took a flight from Miami, Florida to Dubai, United Arab Emirates. VORONCHENKO's return flight to Miami was scheduled for on or about May 30, 2022, but he did not take this flight.  Instead, on or about May 25, 2022, VORONCHENKO booked a flight to Moscow, Russia, which departed from Dubai the next day.

32.    VLADIMIR VORONCHENKO, a/k/a "Vladimir Vorontchenko," the defendant, did not appear before the Grand Jury on or about May 31, 2022, as required by the Grand Jury subpoena.  Nor did he appear at subsequent dates to which his appearance was adjourned, specifically, on or about June 14, 2022 and on or about June 30, 2022.

33.    VLADIMIR VORONCHENKO, a/k/a "Vladimir Vorontchenko," the defendant, VORONCHENKO still has not returned to the United States.

12

## COUNT ONE
**(Conspiracy to Violate the International Emergency Economic Powers Act)**

The Grand Jury further charges:

34.     The allegations set forth above in Paragraphs 1 through 33 are realleged and incorporated by reference as if set fully forth herein.

35.     From at least in or about April 2018 through at least in or about 2022, in the Southern District of New York and elsewhere, VLADIMIR VORONCHENKO, a/k/a "Vladimir Vorontchenko," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other, to violate the IEEPA, in violation of 50 U.S.C. § 1705, Executive Orders 13660, 13661, and 13662, and 31 C.F.R. § 589.201.

36.     It was a part and an object of the conspiracy that VLADIMIR VORONCHENKO, a/k/a "Vladimir Vorontchenko," the defendant, and others known and unknown, would and did willfully and knowingly violate the IEEPA, and the regulations promulgated thereunder, to wit, VORONCHENKO and his coconspirators willfully and knowingly caused United States persons to provide funds, goods, and services to and for the benefit of Vekselberg, whom OFAC had listed as a Specially Designated National on or about April 6, 2018, and to and for the benefit of companies and properties owned and controlled by Vekselberg, and caused United States persons to receive funds, goods, and services from Vekselberg, and from companies owned and controlled by Vekselberg, and did and attempted to transfer, pay, export, withdraw, and otherwise deal in interests in property in the United States held by Vekselberg, without first obtaining the required approval of OFAC, in violation of Executive Orders 13660, 13661, and 13662, and 31 C.F.R. § 589.201, and engaged in and attempted to engage in

transactions that evaded and avoided and caused a violation of Executive Orders 13660, 13661, and 13662, and 31 C.F.R. § 589.201.

(Title 50, United States Code, Section 1705; Executive Orders 13660, 13661, and 13662, and Title 31, Code of Federal Regulations, Section 589.201.)

### COUNT TWO
**(Violation of the International Emergency Economic Powers Act)**

The Grand Jury further charges:

37.     The allegations set forth above in Paragraphs 1 through 33 are realleged and incorporated by reference as if set fully forth herein.

38.     From at least in or about April 2018 through at least in or about 2022, in the Southern District of New York and elsewhere, VLADIMIR VORONCHENKO, a/k/a "Vladimir Vorontchenko," the defendant, willfully and knowingly violated the IEEPA, and the regulations promulgated thereunder, to wit, VORONCHENKO willfully and knowingly caused United States persons to provide funds, goods, and services to and for the benefit of Vekselberg, whom OFAC had listed as a Specially Designated National on or about April 6, 2018, and to and for the benefit of companies and properties owned and controlled by Vekselberg, and caused United States persons to receive funds, goods, and services from Vekselberg, and from companies owned and controlled by Vekselberg, and did and attempted to transfer, pay, export, withdraw, and otherwise deal in interests in property in the United States held by Vekselberg, without first obtaining the required approval of OFAC, in violation of Executive Orders 13660, 13661, and 13662, and 31 C.F.R. § 589.201, and engaged in and attempted to engage in transactions that evaded and avoided and caused a violation of Executive Orders 13660, 13661, and 13662, and 31 C.F.R. § 589.201.

(Title 50, United States Code, Section 1705; Executive Orders 13660, 13661, and 13662; Title 31, Code of Federal Regulations, Section 589.201; and 18 U.S.C. § 2.)

## COUNT THREE
**(Conspiracy to Commit International Money Laundering)**

The Grand Jury further charges:

39.     The allegations set forth above in Paragraphs 1 through 33 are realleged and incorporated by reference as if set fully forth herein.

40.     From at least in or about April 2018 through at least in or about 2022, in the Southern District of New York and elsewhere, VLADIMIR VORONCHENKO, a/k/a "Vladimir Vorontchenko," the defendant, and others known and unknown, willfully and knowingly did conspire to commit a violation of 18 U.S.C. § 1956(a)(2)(a).

41.     It was a part and an object of the conspiracy that VLADIMIR VORONCHENKO, a/k/a "Vladimir Vorontchenko," the defendant, and others known and unknown, would and did willfully and knowingly transport, transmit, and transfer, and attempt to transport, transmit, and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, to wit, violations of the IEEPA, in violation of 50 U.S.C. § 1705, Executive Orders 13660, 13661, and 13662, and 31 C.F.R. § 589.201.

(Title 18, United States Code, Section 1956(h).)

## COUNT FOUR
**(International Money Laundering)**

The Grand Jury further charges:

42.     The allegations set forth above in Paragraphs 1 through 33 are realleged and incorporated by reference as if set fully forth herein.

15

43.     From at least in or about April 2018 through at least in or about 2022, in the Southern District of New York and elsewhere, VLADIMIR VORONCHENKO, a/k/a "Vladimir Vorontchenko," the defendant, willfully and knowingly did transport, transmit, and transfer, and attempt to transport, transmit, and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, to wit, violations of IEEPA, in violation of 50 U.S.C. § 1705, Executive Orders 13660, 13661, and 13662, and 31 C.F.R. § 589.201.

(Title 18, United States Code, Sections 1956(a)(2)(A) and 2.)

## COUNT FIVE
## (Contempt of Court)

The Grand Jury further charges:

44.     The allegations set forth above in Paragraphs 1 through 33 are realleged and incorporated by reference as if set fully forth herein.

45.     On or about June 14, 2022 and June 30, 2022, in the Southern District of New York and elsewhere, VLADIMIR VORONCHENKO, a/k/a "Vladimir Vorontchenko," the defendant, willfully and knowingly disobeyed and resisted a lawful writ, process, order, decree, and command of a court of the United States, to wit, VORONCHENKO failed to appear before a Grand Jury in the Southern District of New York on or about June 14, 2022 and on or about June 30, 2022, as required by a Grand Jury subpoena, dated on or about May 11, 2022.

(Title 18, United States Code, Sections 401(3) and 2.)

16

## FORFEITURE ALLEGATIONS

46.     As a result of committing the offenses alleged in Counts One and Count Two of this Indictment, VLADIMIR VORONCHENKO, a/k/a "Vladimir Vorontchenko," the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all property, real and personal, which constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Count One and Count Two, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses and the following specific property:

        a.     Medallion, Inc., a Panamanian company;

        b.     Voxi Management Corp., a Bahamian company;

        c.     515 Park Avenue, Apartments 21 & 2I, New York, New York 10022;

        d.     19 Duck Pond Lane, Southampton, New York 11968;

        e.     7182-1873 Fisher Island, Apts. 7182 & 7183, Fisher Island, Florida 33109; and

        f.     7002 Fisher Island, Apt. 7002 PH2, Fisher Island Florida 33109.

47.     As a result of committing the offenses alleged in Count Three and Count Four of this Indictment, VLADIMIR VORONCHENKO, a/k/a "Vladimir Vorontchenko," the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in said offense, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense and the following specific property:

17

a.    Medallion, Inc., a Panamanian company;

b.    Voxi Management Corp., a Bahamian company;

c.    515 Park Avenue, Apartments 21 & 2I, New York, New York 10022;

d.    19 Duck Pond Lane, Southampton, New York 11968;

e.    7182-1873 Fisher Island, Apts. 7182 & 7183, Fisher Island, Florida 33109; and

f.    7002 Fisher Island, Apt. 7002 PH2, Fisher Island Florida 33109.

<u>Substitute Asset Provision</u>

48.    If any of the property described above as being subject to forfeiture, as a result of any act or omission of VLADIMIR VORONCHENKO, a/k/a "Vladimir Vorontchenko," the defendant,

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and

Title 28, United States Code, Section 2461 to seek forfeiture of any other property of the defendant

up to the value of the forfeitable property described above.

(Title 18, United States Code, Sections 981; Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)


FOREPERSON

DAMIAN WILLIAMS
UNITED STATES ATTORNEY